This is United States v. Gumila. Mr. Van Zandt. May I please report? I'd like to begin the discussion today with pointing out two uncontroversial propositions and one very controversial question, which is what brings us here today. In fraud cases, loss amount drives sentencing. That is a fact of the law at the district court level and on appeal. And it drives the guidelines of determination. In Medicare fraud cases specifically, loss amount is presumptively the dollar value of the fraudulent bills that were submitted to the government. Both those points are uncontroversial. They're in the sentencing guidelines. What is controversial and what is the main issue in this case is how do we determine which bills are fraudulent and which aren't and what the amount of the fraud is in cases like this where we're dealing with tens of thousands, if not hundreds of thousands of claims overall by a real company that's delivering real services and how should that determination, whatever it is, impact the final sentence that's delivered by the district court. What this case is not is a case of ghost billing. One of the cases brought up by the government in their response was United States v. Sutton. It wasn't heavily discussed, but I think it's very illuminating when compared to this case. In Sutton, the company didn't exist. Tens of thousands, actually I take that back, I think it was several hundred thousand claims were submitted by the defendant in Sutton. And at trial they proved that the company simply wasn't there. This was all paper that was shuffled around and submitted. The company didn't really exist. And it was very easy for this court in that case to say that at sentencing, even though the government had only proven a small subset of claims were fraudulent at trial, it was very easy to say that all of the claims, every last one of them submitted to Medicare, were fraudulent and should count towards loss in that case. That's not what we have here. Doctor at Home was indisputably a real company. It served real patients with real doctors and submitted hundreds of thousands of claims. At trial, the government, however, submitted only evidence regarding eight patients. Regarding what? Eight patients. So eight of the tens of thousands of patients that Doctor at Home treated in the course of its existence were actually presented to the jury at trial and the jury found the defendant guilty. Right. Those were exemplary of what was going on here, but there was also evidence at trial that, just take the home visits billing issue, that some 60% of home visits were completely unnecessary and that they were phony and fraudulent. So the fact that there were just eight specific instances that were put into evidence doesn't take away from the global evidence that in the three categories of phony billing here, there was widespread fraud because these services were completely unnecessary and that the employees were instructed by your client to fabricate these billings, to alter the coding to make it seem as though this was a legitimate need for a home visit, that this was a legitimate need for skilled nursing and care plan oversight. I think this case isn't about the conviction, Your Honor. What it is about is the sentencing, and I think that scaling as a matter of general practice is not necessarily controversial. What is controversial is the evidence that the government submitted in this case and how much fraud was going on. Right, but as I understand the district court's findings here, and that's what we're here reviewing as to the loss amount, the evidence at trial demonstrated that the vast majority of these three categories of services entailed phony billing. These services were not, in fact, required, and your client was instructing the employees to say that they were when they weren't. And that's precisely the findings that we disagree with on appeal, Your Honor. Taking just one of the categories, for instance, just the actual home visits, when we're talking about the upcoding, it is undisputed that by the government that these visits were medically necessary, they were appropriate. What's at issue is were they upcoded, were they overbilled, and if so, how much? Now what the government has done, this methodology that the government is using, they've assumed that everything above a 99348, which was the code that they chose, so the 349s and 350s, they've assumed that all those were fraudulent. That's not consistent with the evidence that was presented at trial. At trial, we had witnesses testifying, well, yes, some of them were maybe 20 percent, maybe 30 percent, maybe 40 percent. Maybe every single one of them was. And the question, and this is our issue with the district court's finding at the trial level, is that's not sufficient at sentencing. What sentencing requires, even though it's a preponderance of the evidence, it still has to be reliable evidence that shows that that is accurate. And the evidence at trial was all over the place. It was not accurate to say, as the government said at sentencing, every single one of these above 99348s is fraudulent, and the defendant must prove that they're not. That's not accurate. Are you saying there was no fraud or that she wasn't complicit in any of it? That's a slightly separate argument, Your Honor, and that's mostly as to the home health care issue. The jury found what it found, and that's not something that we can dispute on appeal at this point. The question is the extent, and the question is what she is going to be held liable for. And this isn't a case where we're only talking about a few hundred thousand dollars or something like that. What the district court found was $15.6 million worth of fraud that the defendant and the defendant alone right now is responsible for. That defendant is what? The defendant is responsible for. That is what the district court found. That is what she was sentenced on. That is what drove the guidelines up to 151 months on the bottom, and that's the restitution order that the district court imposed. And when we're talking about numbers like this and the district court's factual findings were based on evidence at trial that wasn't accurate even by the government's own witnesses, the question that we have here and the reason for this appeal is, is that proper? And our position is it's not. We need more evidence. Our position down below was what was proven at trial was eight patients. It was, depending on how you analyze it, somewhere between $14,000 and $100,000. That's what the jury found. That was the evidence that was presented at trial, and it was determined beyond a reasonable doubt. At sentencing, however, the government piled on an additional $15.4 million in things that they said that the defendant was responsible for and should be held accountable for, and it drove the sentencing determination. And that matters a lot because even though the 3553A factors do apply and that can ultimately result in a different sentence, it starts it out in a very different position. To use a sports analogy, we're talking about the difference between starting on the 50 and starting on the 1. And because the district court examined it in the way it did and basically took the government's methodology for what it was, that created significant problems and affected the entire rest of the sentencing because we started at 151 months, presumptively. Moving on to your question about the home health care agencies, that's a much more interesting question because it also indicates application 03E, which requires that the defendant receive a credit, be credited for the value of the services that were actually delivered. Now the government did give that credit with relation to the home visits. It basically subtracted the value of the 99348s from the rest of the bills. It didn't give that for the home health care agency bills, which added up to something like, I think, $9.3 million. And the government doesn't really engage with this. This is a clear application that requires the fair market value of services rendered to be deducted from the loss amount. And there is no question in this case that services were actually rendered. There were home visits by a doctor at home. The home health care agencies, it's undisputed that they actually rendered services to these patients. Unlike Sutton, which I was trying to... A typical statement by the government is, an email showed the defendant knew that one doctor, Kamram Hashimi, did short visits, sometimes didn't speak with patients during visits, and did nothing during visits except for listening to the patient's hearts and lungs. Now is that a... That email... Is there such an email? I think I know which one you're talking about, Your Honor. I think that was also the subject of an objection. The problem is... What was the objection? I believe that was hearsay, if I recall correctly. I think we lost that objection. That what? I believe it was hearsay. There's a double hearsay issue that we dealt with at the trial level. I don't understand. It's an email. What's the hearsay? If I recall correctly, it was someone else reporting what Hashimi had said. And I'd have to look at the record to be sure. But either way, even assuming that that's properly admissible and something the district court can take into account, short visits don't mean that fraud... No, no. Short visits, sometimes didn't speak to the patients during the visits, and did nothing during the visits except listening to the heart and lungs. That sounds like fake. That sounds fake, right? Well, it depends on... It's phony. Well, wait a second. Depending on what the patient's illness is, just listening to his heart and lungs is not proper treatment. I don't know that for certain, Your Honor. Pardon? I don't know that for certain, but assuming... Well, wait a second. What if you have a broken ankle and the doctor says, well, let me listen to your heart. I'll listen to your heart and your lungs. Your hearts and lungs are... Your hearts and lungs... Your heart and your lungs are fine, so get out. And that actually goes to my point, Your Honor, is that we don't know. All of these claims that the government asserts were fraudulent, we don't know what those patients had. We don't know what their medical conditions were. And this was discussed pretty extensively at trial and sentencing. You have to know what the issue with the patient was to know whether or not the medical treatment that was provided was actually justifiable by the billing level, and that's the problem. Actually, no. The claim here is that a large majority of these patients didn't qualify for home visits at all, so it really doesn't matter what services were rendered once the medical professionals were in the home. Your client wasn't entitled to bill for them at all because they're not homebound. That's at least in terms of this category of billing. You've got some other categories, too. But this category, you don't get an offset for the value of the services that were rendered if the reason why this is fraudulent is that none of these services were billable at all. Not just that they were over-delivered or under-delivered. That question doesn't matter. Well, and that's actually the reason I bring up Sutton, Your Honor. That's the case that the government cited for that proposition. When you actually look at Sutton, that's not what it says. This court decided they weren't entitled to that because the company didn't exist, and it's not a question of in Sutton they didn't deliver the care at all. I'm making a different point here, and I think you're missing it or evading it, one or the other. The point is not whether or not services were rendered. Apparently services were rendered, but your client doesn't get an offset for the value of those services because none of these 60% or so of the home visits were billable at all because these weren't homebound patients. No, I certainly understand your point. I'm sorry if I seem like I'm evading it. If they don't qualify for any services, then it doesn't matter what the value of the services that were rendered was. Your client doesn't get the offset. The reason for the fraud is that they weren't homebound. Nobody should have been sent in the first place. I think two responses to that, Your Honor. One, this is the factual dispute that we were arguing about at sentencing is what the percentage was that were allegedly not homebound, and that dealt with the definition of homebound that we dealt with throughout trial. The second issue is I'm... You can't just say that because there are factual disputes you win. No, that would take us into the clearly erroneous issue, Your Honor. But what my point... The factual disputes usually are resolved in trial. Right, and that was not... The question at sentencing is whether or not there's reliable evidence that was presented at trial, and when we're talking about 60%, 40%, that's my point there, is that the determination of what percentage of patients were homebound or not was all over the place. And the issue at sentencing is, is there enough reliable evidence to know that that is an accurate number to then use to sentence Mr. Mila to find a guidelines range of 151 months and $15 million in fraud based on estimates that are... Well, there was a jury verdict, wasn't there? Right, but it was related to only those eight patients. Only what?  that the government sought at sentencing. I see I'm moving into my rebuttal time. If there's no other questions, I'll yield to Mr. Lee. So did you present evidence from patients? I'm sorry, Your Honor? Did you present evidence from patients? We cross-examined patients. We did not present any evidence directly. I don't know how you complain about just eight patients. No, we're not. You don't have any patients. As to those eight patients, Your Honor, at trial, that was my suggestion at sentencing, was that's what the jury found. That's the loss amount that the court should use. That was my suggestion. But the government's position was that the eight were representative, not that they were the entire set of victims. Certainly, Your Honor, and that returns us to the question of did the government present enough evidence of what the actual extent of the remaining victims was, and my position is they did not, based on the evidence that they were relying on. Okay. Well, thank you, Mr. Van Zandt. Mr. Lee? May it please the Court? My name is Stephen Lee. The loss calculation here was based, first, on specific claims that were the basis of the counts of indictment and the basis for the counts of conviction. Second, testimony emails showing overall patterns involving these types of claims. And third, extrapolation over the claims that the defendant submitted over the course of the scheme and that the defendant helped others submit over the course of the scheme. This resulted in three large categories of loss and an overall reasonable estimation of loss based on preponderance of the evidence. In terms of the first category, the home visits, first of all, this is not an undisputed point. The government's position was that many of these visits were not medically necessary, and in large part, because these patients did not need to be seen at the home. They could go to office visits. Why weren't any of the owners of the business prosecuted? Your Honor, one of the issues that we need to prove in health care fraud cases is willfulness. We need to prove that the particular defendants knew that their conduct was illegal. This particular person who was charged was herself a medical professional and someone who was very involved in the company, more so than I think the record shows than anyone else who was higher up than her in the company. She was the one who held herself out as the head of clinical operations. So the owners were not aware of her practices? Or is that the idea? They didn't know that she did these questionable things? Your Honor, I believe the defendant introduced some evidence regarding the owners in her defense case. I think the record does not show that those people had the same level of expertise and medical experience that she did. I think we find that a lot of these cases, especially, again, the key issue for charging and convicting particular people is their individual state of mind. So if an owner doesn't know enough, then that person would not be held liable. So in terms of the home visits, it was our position that many of those visits were not medically necessary. And on top of that, the evidence showed that many of the visits were being done not because the patients had any medical concern or problem whatsoever, but because they were being solicited by the defense company and being told things like, the doctor can come see you tomorrow. What time can he come see you? Things being driven by the company policy and not by any patient need. In terms of the home health payments, the defendant was very aware that she and her company were getting patients from home health agencies, which wanted these doctors to certify these patients back for home health services by these companies. And she took steps to make sure the patients were certified, whether or not the patients actually qualified for these services. The loss amount here of about $9.5 million is actually quite conservative, given that it's focusing on just two of the many doctors who certified hundreds of patients for multiple home health agencies over the course of the scheme. And the third category of loss, the care plan oversight, that is probably the closest to what defense counsel referred to as ghost billing, because that's a category where the defendant was billing for oversight services which were not actually even being done. Multiple providers testified at trial that they had done the services that were being billed, and the documentation for those services was based on false documentation created by non-medical professionals, many of whom were not even in this country. Based on all this, the district court was able to look at all the evidence and was able to make a reasonable calculation of loss based on all of the evidence that was presented over the course of the trial and the additional information presented at sentencing. What is the purpose? Is it mandatory that restitution has to include every penny that the defendant has appropriated? I believe that, yes, that it was required for... So she actually got $15,600,000? No, Your Honor. Her company received about $6 million of the loss. The other $9.5 million of loss, that went to the home health agencies that were effectively the defendant's partners. So that money did not go to her, but the entire amount is the result of the conduct that she created and she... Okay, that's fine, but is it real... She'll never be able to pay $15,600,000. It is unlikely that she'll be able to do so, Your Honor, but that doesn't change the obligation for the district court to order mandatory restitution to the victims of the offense, here being Medicare. Well, when it becomes... After she's released from prison, if it's clear that there's no chance of her ever having money of that sort, would the judge be able to change the amount? I am not sure about that, Your Honor. There may come a point... Obviously, there are certain aspects in terms of what the government may do later on in terms of seeking to enforce or not enforce some of those outstanding restitution amounts, but I don't... I think that's for a much later stage. Unless the court has any further questions, the government asks you to affirm the sentence. Okay, thank you, Mr. Lee. So, Mr. Van Zandt, do you have anything further? The only point I would have, Your Honor, is just as to the restitution issue and the loss amount that actually flows to the defendant. As far as I'm aware, the record does not show the defendant receives anything other than her salary in this case. She wasn't an owner of the company. She didn't, so far as the record shows, put anything in her own pocket, so that is a situation where she is on the hook for $15.9 million. I honestly don't know where that's going to come from eventually. Well, restitution isn't, in the nature of an unjust enrichment, kind of a theory. She's liable for it, whether she was enriched to that amount or not. I certainly understand that, Your Honor. And what it does matter to, though, is my point in our third argument about whether or not the sentence was substantively unreasonable. And what matters here is she was sentenced to not only 72 months incarceration, but she's also been hit with this restitution order, which I think we probably can all agree is unlikely to ever be paid. And I think that, so far as the substantive reasonableness, that's one of the biggest issues that was not dealt with by the trial court that should have been heavily considered. And I think that does, as far as the substantive reasonableness of the sentence, significantly impact it. The other point I would like to point out to the court is also in regard to the substantive reasonableness is the Second Circuit's decision in Olga Haim, which I mentioned in the reply. One of the issues that's very timely right now is the question of how the loss amount guidelines for fraud were developed and created. They don't have any connection to empirical studies or reality. They've just been continuously increased. What the Second Circuit did in Olga Haim was to vacate the sentence and remand it back to the district court to consider whether or not to give a lower sentence based on that. And that's something that I wanted to flag for the court that I think is important to consider because this is an issue that has come up a lot in not only this case but other fraud cases as well. For those reasons, we'd ask that this court vacate the sentence. Okay. Well, thank you very much, Mr. Van Zandt and Mr. Lee.